## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RICHARD MERRITTS, derivatively on behalf of THE KRAFT HEINZ COMPANY, | Case No. |
| Plaintiff, | Honorable Robert M. Dow Jr. |
| v. | |
| 3G CAPITAL, INC.; 3G GLOBAL FOOD HOLDINGS, LP; 3G GLOBAL FOOD HOLDINGS GP LP; 3G CAPITAL PARTNERS II LP; 3G CAPITAL PARTNERS LTD.; HK3 18 LP; BERNARDO HEES; PAULO BASILIO; DAVID KNOPF; GREGORY ABEL; ALEXANDRE BEHRING; JOHN T. CAHILL; TRACY BRITT COOL; FEROZ DEWAN; JEANNE P. JACKSON; JORGE PAULO LEMANN; JOHN C. POPE; MARCEL HERMANN TELLES; ALEXANDRE VAN DAMME; and GEORGE ZOGHBI, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| THE KRAFT HEINZ COMPANY, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................... 1

JURISDICTION AND VENUE .............................................................................................. 4

PARTIES .................................................................................................................................. 5

SUBSTANTIVE ALLEGATIONS ........................................................................................ 8

I.     THE CREATION OF KRAFT HEINZ IN 2015 ............................................... 8

II.    3G CAPITAL'S ZERO-BASED BUDGETING BUSINESS MODEL ............................. 9

III.   AFTER THE MERGER, DEFENDANTS FALSELY ASSURED INVESTORS
THAT KRAFT HEINZ WAS SUCCESSFULLY IMPLEMENTING ZBB ................. 11

IV.   UNBEKNOWST TO INVESTORS, KRAFT HEINZ IMPLEMENTED
DESTRUCTIVE AND UNSUSTAINABLE COST-CUTTING MEASURES
THAT IMPAIRED THE COMPANY'S OPERATIONS AND DAMAGED ITS
BRANDS .................................................................................................................. 13

        A.    Cost Cuts to Kraft Heinz's Core Brand Support Functions ................................... 14

        B.    Cost Cuts to Kraft Heinz's Core Supply Chain Functions ................................... 16

        C.    Kraft Heinz Has Since Admitted The Damage Done To Its Brands And Supply
Chain ................................................................................................................ 18

V.    THE SIGNIFICANCE OF KRAFT HEINZ'S GOODWILL AND
TRADEMARKS ...................................................................................................... 20

VI.   KRAFT HEINZ'S 2018 IMPAIRMENT TESTING ...................................................... 21

VII.  ██████████████████████████████████████████████ ................................ 23

VIII.  ██████████████████████████████████████████████ ................................ 25

IX.  ██████████████████████████████████████████████ .......... 28

X.    WHILE AWARE OF THE MATERIAL, NEGATIVE INFORMATION, 3G
CAPITAL SOLD $1.23 BILLION OF STOCK. .......................................................... 33

XI.   DEFENDANTS' ADDITIONAL MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS ................................................................. 33

      A.   Defendants' Additional Misstatements And Omissions ....................................... 33

      B.   Defendants' Statements Were Materially False And Misleading ......................... 41

XII.  THE TRUTH IS FINALLY REVEALED, CAUSING KRAFT HEINZ'S STOCK
      PRICE TO PLUMMET ......................................................................... 43

DERIVATIVE ALLEGATIONS ....................................................................... 45

DEMAND ON THE BOARD IS EXCUSED BECAUSE IT IS FUTILE ................................... 45

I.    COUNT I:  INSIDER TRADING AND MISAPPROPRIATION OF
      CORPORATE INFORMATION ................................................................... 46

II.   COUNT II:  ISSUING MISLEADING STATEMENTS AND OMISSIONS ................................ 55

III.  COUNT III:  RIGHT TO CONTRIBUTION ....................................................... 56

CLAIMS FOR RELIEF ............................................................................ 57

COUNT I ...................................................................................... 57

COUNT II ..................................................................................... 58

COUNT III .................................................................................... 60

PRAYER FOR RELIEF ............................................................................ 61

Plaintiff Richard Merritts ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant The Kraft Heinz Company ("Kraft Heinz" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants for breaches of their fiduciary duties to the Company. Plaintiff makes the following allegations based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by his attorneys. This investigation included, among other things, a review of documents produced by Kraft Heinz in response to Plaintiff's demand under 8 *Del. C.* § 220 ("Demand"); the Defendants' statements during conference calls; the Company's press releases; the Company's filings with the United States Securities and Exchange Commission ("SEC"); and news reports and research analysts' reports about the Company. Plaintiff believes that there is substantial evidentiary for the allegations set forth herein and additional support will be uncovered after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. On August 7, 2018, Defendant 3G Capital, Inc. ("3G Capital"), through various affiliated entities, sold 20,630,314 shares of the Company's stock at a price of $59.85 per share. This sale was favorably timed and was based on material information that had not been shared with the Company's stockholders.

2. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

1

3. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

4. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

5. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

6. Just four days later, on August 7, 2018, Defendant 3G Capital, through its affiliated

entities, sold 20,630,314 shares of the Company's stock at a price of $59.85 per share, for proceeds of $1.23 billion. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

7.      ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████      On November 2, 2018, Kraft Heinz announced its 2018 third quarter earnings.  In its announcement, Kraft Heinz disclosed a $215 million impairment to its *Smart Ones* trademark.  The price of the Company's stock fell nearly 10%, closing at $50.73 per share.

8.      Then, on February 21, 2019, just six months after 3G Capital's sale, Kraft Heinz revealed the full scope of the negative trends affecting its business when it announced its 2018 fourth quarter earnings results.  On that day, Kraft Heinz announced a ***$15.4 billion*** impairment charge related to certain goodwill and trademarks, primarily the U.S. Refrigerated and Canada Retail reporting units, and the *Kraft* and *Oscar Mayer* trademarks.  ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

9.      As a result of the $15.4 billion impairment, Kraft Heinz reported a net loss attributable to common shareholders of $12.6 billion and a diluted loss per share of $10.34.  Kraft Heinz also announced it was lowering its quarterly dividend by $0.225 to $0.40 per share.

10.      In response to the 2018 fourth quarter results, the price of Kraft Heinz common stock fell $13.23 per share, or almost ***28%***, from $48.18 per share on February 21, 2019, to $34.95

per share on February 22, 2019.  Thus, by selling at $59.85 per share back on August 7, 2018, 3G Capital avoided losses in excess of *$500 million*.

11.     On March 1, 2019, Kraft Heinz received a subpoena from the SEC related to the Company's assessment of goodwill and intangible asset impairments and related matters.

12.     ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ By selling $1.23 billion of stock, 3G Capital breached its fiduciary duty to the Company and its stockholders.

13.     In this derivative action, Plaintiff, on behalf of Kraft Heinz, seeks to recover for the harm sustained by the Company as a result of the breaches of fiduciary duty by 3G Capital and the Company's directors and officers.  Plaintiff also seeks a return of the illicit insider trading profits made through the use of confidential Company information.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction under 28 U.S.C. § 1331 because the claims asserted herein arise under Section 21D of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78u-4(f)), and Item 303 of Regulation S-K, 17 C.F.R. § 229.303 promulgated thereunder. This Court has exclusive jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and, to the extent necessary, supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.

15.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.  Additionally, Kraft Heinz's

principal place of business is located in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17.     Plaintiff Richard Merritts is a stockholder of Kraft Heinz and has continuously owned shares of the common stock of the Company and its predecessor entity, Kraft Foods Group, Inc., since April 3, 2014.

18.     Nominal Defendant Kraft Heinz is a Delaware corporation, with its principal offices located at One PPG Place, Pittsburgh, Pennsylvania 15222.

19.     Defendant 3G Capital is a private equity firm specializing in buyout investments in brands and businesses in the retail and consumer sectors.  Through its affiliated entities, 3G Capital was one of the largest beneficial owners of Kraft Heinz common stock.

20.     Defendant 3G Global Food Holdings, LP is affiliated with Defendant 3G Capital and is one of the entities involved in effecting the sale of 20,630,314 shares of stock by 3G Capital on August 7, 2018.

21.     Defendant 3G Global Food Holdings GP LP is a Cayman Islands limited partnership and the general partner of 3G Global Food Holdings, LP, and is also affiliated with 3G Capital.

22.     Defendant 3G Capital Partners II LP is a Cayman Islands limited partnership and the general partner of 3G Global Food Holdings GP LP, and is also affiliated with 3G Capital.

23.     Defendant 3G Capital Partners Ltd. is a Cayman Islands exempted company and

the general partner of 3G Capital Partners II LP, and is also affiliated with 3G Capital.

24.     Defendant HK3 18 LP is an affiliate of Defendant 3G Global Food Holdings, LP, and is the actual entity through which 3G Capital sold the 20,630,314 shares of stock on August 7, 2018.   On August 6, 2018, 3G Global Food Holdings, LP transferred 20,630,314 shares of Kraft Heinz stock to HK3 18 LP.  On August 7, 2018, HK3 18 LP sold those shares, which were its sole assets, for total proceeds of $1,234,724,292.90.

25.     Collectively, Defendants 3G Capital, Inc., 3G Global Food Holdings, LP, 3G Global Food Holdings GP LP, 3G Capital Partners II LP, 3G Capital Partners Ltd. and HK3 18 LP are hereinafter referred to as the "3G Defendants."

26.     Defendant Bernardo Hees ("Hees") served as the Company's Chief Executive Officer ("CEO") from its formation in July 2015, until 2019, when he was replaced by Miguel Patricio.  On April 22, 2019, Kraft Heinz announced that Hees would leave Kraft Heinz.  Hees has been a partner at 3G Capital since July 2010.

27.     Defendant Paulo Basilio ("Basilio") is the Chief Business Planning and Development Officer for Kraft Heinz.  He was previously President of the U.S. Commercial Business and Executive Vice President and Chief Financial Officer ("CFO") until October 2017. Basilio has been a partner of 3G Capital since July 2012.

28.     Defendant David Knopf ("Knopf") is the current CFO of the Company, and is responsible for all finance and IT functions globally.  Knopf has been a partner of 3G Capital since 2015.

29.     Defendant Gregory Abel ("Abel") has served as a director of the Board since July 2015.

30.     Defendant Alexandre Behring ("Behring") has served as a director of the Board and

Chairman of the Board since July 2015. Behring is a co-founder of 3G Capital, and has been the managing partner and a director of the board of 3G Capital since 2004.

31.     Defendant John T. Cahill ("Cahill") has served as a director of the Board and as the Vice Chairman of the Board since July 2015. Cahill is the former CEO of Kraft Heinz's predecessor company, Kraft Foods Group, Inc.

32.     Defendant Tracy Britt Cool ("Cool") served as a director of the Board from July 2015 until 2020.

33.     Defendant Feroz Dewan ("Dewan") has served as a director of the Board since October 2016.

34.     Defendant Jeanne P. Jackson ("Jackson") has served as a director of the Board since July 2015.

35.     Defendant Jorge Paulo Lemann ("Lemann") has served as a director of the Board since July 2015. Lemann is a co-founder of 3G Capital, and has served as a director of the board of 3G Capital since 2004.

36.     Defendant John C. Pope ("Pope") has served as a director of the Board since July 2015.

37.     Defendant Marcel Hermann Telles ("Telles") served as a director of the Board from July 2015 until June 12, 2019, when he retired. Telles is a founding partner of 3G Capital, and has been a director of the board of 3G Capital since 2004.

38.     Defendant Alexandre Van Damme ("Van Damme") has served as a director of the Board since April 2018.

39.     Defendant George Zoghbi ("Zoghbi") has served as a director of the Board since April 2018.

## SUBSTANTIVE ALLEGATIONS

### I.   THE CREATION OF KRAFT HEINZ IN 2015

40.     Kraft Heinz is one of the largest global food and beverage companies, with 2018 net sales of approximately $26 billion.  The Company has sales in approximately 190 countries and territories, and manufactures and markets food and beverage products, including condiments and sauces, cheese and dairy, meals, meats, refreshment beverages, coffee, and other grocery products.  The Company has a portfolio of a diverse mix of iconic and emerging brands, including *Heinz*, *Kraft*, *Oscar Mayer*, *Philadelphia*, *Velveeta*, *Lunchables*, *Planters*, *Maxwell House*, *Capri Sun*, *Ore-Ida, Kool-Aid*, and *Jell-O.*  The Company views itself as "guardians of these brands and the creators of innovative new products, [and] dedicated to the sustainable health of our people and our planet."

41.     Kraft Heinz was formed on July 2, 2015 through the merger ("Merger") of Kraft Foods Group, Inc. ("Kraft") and H.J. Heinz Holding Corporation ("Heinz").  Before the Merger, Kraft was a publicly-traded company, while Heinz was jointly owned by Berkshire Hathaway Inc. ("Berkshire Hathaway") and 3G Capital (through its affiliate, Defendant 3G Global Food Holdings, LP).  Prior to the Merger, Kraft manufactured and marketed food and beverage products, including cheese, meats, refreshment beverages, coffee, packaged dinners, refrigerated meals, snack nuts, dressings, and other grocery products, primarily in the United States and Canada.  Prior to the Merger, Heinz manufactured and marketed an extensive line of food products, including ketchup, condiments and sauces, frozen food, soups, beans and pasta meals, infant nutrition, and other food products.

42.     Following the Merger, Heinz's controlling stockholders, Berkshire Hathaway and 3G Global Food Holdings, LP, owned approximately 51% of the outstanding shares of Kraft Heinz

common stock. Kraft stockholders owned the remaining 49% of the merged company. According to the Company's proxy statement filed on August 2, 2019 ("2019 Proxy"), as of July 15, 2019, 3G Global Food Holdings, LP (and its affiliated entities) own 22.1% of outstanding Kraft Heinz common stock, while Berkshire Hathaway owns 26.7%. The 2019 Proxy states that, as a result of the Merger, Berkshire and 3G Capital together "may be deemed to be a group" for purposes of Section 13(d) of the Exchange Act.

43.     Under the terms of the Merger, Kraft Heinz's Board consisted of five directors appointed by Kraft, and six directors appointed by Heinz.

44.     After the Merger, Kraft Heinz was led by an executive team whose most senior members were affiliated (as partners or otherwise) with 3G Capital. For example, Defendant Hees became Kraft Heinz's CEO. Defendant Hees is also a partner of 3G Capital. Defendant Basilio became Executive Vice President and CFO of Kraft Heinz. Basilio has been a partner of 3G Capital since July 2012. Similarly, Pedro Drevon became President of Kraft Heinz's Latin America Zone after serving as a partner of 3G Capital. On October 1, 2017, Defendant Knopf assumed Defendant Basilio's responsibilities and became Executive Vice President and CFO at Kraft Heinz. Knopf has been a partner of 3G Capital since 2015.

## II.     3G CAPITAL'S ZERO-BASED BUDGETING BUSINESS MODEL

45.     3G Capital is a Brazilian-American private equity firm known for achieving significant cost reduction in the portfolio companies under its management by, among other things, implementing zero-based budgeting ("ZBB"). Most companies use a form of budgeting where departments use the previous year's budget as a starting point to create the next year's budget. Zero-based budgeting is a method of budgeting in which a department starts with no budget at all. The individual departments must justify all expenses for each new annual budget.

46. 3G Capital's track record in implementing ZBB was one of the key reasons for the Merger. After taking over as CEO of the pre-merger Heinz in 2013, Defendant Hees produced industry-leading margins and cut costs. The plan was to repeat this formula in the newly-merged Kraft Heinz. For example, in a Form S-4 filed on April 10, 2015, Kraft's board of directors explained to Kraft stockholders the board's reasons for recommending the Merger, and identified the following factors: "the synergies and other benefits to the combined company that could result from the merger, including an enhanced competitive and financial position, increased diversity and depth in its product line and geographic areas (providing for significant international growth opportunities) and the potential to realize, according to Heinz management, an estimated $1.5 billion in annual cost savings from the increased scale of the new organization, the sharing of best practices and cost reductions by the end of 2017; [and] the investing and operating track record of Berkshire Hathaway and 3G Capital, including 3G Capital's strong track record in achieving significant cost reduction and margin improvement in companies under its management."

47. 3G Capital's reassurances were critically important to the market. Investors initially worried that 3G Capital would attempt to expand Kraft Heinz's operating margins through, as Deutsche Bank analysts put it, "relentless cost reduction" at the expense of brand investment and operational performance. Investors sought reassurances from Defendants that 3G Capital would deploy ZBB in a growth-centric way, rather than, as Credit Suisse analysts stated in a March 25, 2015 report, cutting "muscle, not just fat" when it assumed control of Kraft Heinz, "thus sacrificing its ability to generate sustainable growth."

48. However, ZBB has its limitations, especially when it comes to a company with a portfolio of aging products. Under those circumstances, ZBB is only effective if there is a steady stream of acquisitions of companies ripe for cost cutting. Alternatively, the company simply must

10

develop new products that appeal to customers. In fact, ZBB may actually hurt a company's existing brands, by starving products of funds much needed for marketing and innovation. As the Boston Consulting Group wrote in March 2017, in a report entitled *Zero-Based Budgeting for the Growth-Oriented CEO*, "when it is applied clumsily, ZBB can have a demoralizing impact that distracts the organization from growth and value creation."

## III.   AFTER THE MERGER, DEFENDANTS FALSELY ASSURED INVESTORS THAT KRAFT HEINZ WAS SUCCESSFULLY IMPLEMENTING ZBB

49.     Following the Merger, and consistent with 3G Capital's promises to investors, Kraft Heinz reported "best-in-class" earnings margins fueled by the Company's cost-saving measures. In the third quarter of 2015, Kraft Heinz's first fiscal quarter following the Merger, the Company reported a 23.3% EBITDA margin, 6% ahead of its industry peers.[1] By the third quarter of 2016, Kraft Heinz reported that it had leveraged its cost-savings program to expand its EBITDA margin to 28.8%.

50.     In their public statements, Defendants repeatedly attributed these successes to the Company's ZBB-based strategy. On conference calls with investors and in SEC filings, Defendants repeatedly touted the sustainability of Kraft Heinz's cost-saving measures and their ability to generate long-term growth for the Company, and frequently cited the Company's success in achieving "synergies," "integration savings," and "efficiencies." For example:

- On the Company's November 5, 2015 earnings call, Basilio trumpeted the "$1.5 billion [in] *synergy savings*" available to Kraft Heinz.

- On Kraft Heinz's August 4, 2016 earnings call, Zoghbi assured investors, "our savings are coming in faster than planned and *we are achieving these savings without sacrificing quality*." On that same call, Basilio affirmed that Kraft

---

[1]     EBITDA margins are the earnings a company generates before interest, taxes, depreciation and amortization, as a percentage of revenue. EBITDA margins are a measure of a company's profitability and assist investors with ascertaining, among other things, the effectiveness of a company's cost-cutting efforts.

Heinz had achieved "$300 million in **synergies**."

- On that same call, Basilio touted the Company's "$300 million of savings" flowing from "our **integration program**," and stated, in particular, that the Company had "put a critical step [in that program] behind us," namely the "integration" of the Company's supply chain and enterprise systems onto the "SAP" platform. Basilio further assured investors that these savings had not come at the expense of operational performance: "we did this **while keeping our case fill rate in the United States on target at 98%** with minor service issues in food service **already addressed**. In fact, we had **very good execution** around the world in Q2."[2]

- On Kraft Heinz's November 1, 2017 earnings call, Knopf highlighted the "**cost efficiencies**" that "continue to drive EBITDA growth."

51. Defendants also reassured investors that the Company was strongly investing in its brands and infrastructure and was even increasing its "working media" spend (*i.e.*, money spent on buying advertising space and airtime, and promotional activity). Moreover, Defendants trumpeted the Company's "best-in-class" operational performance and assured investors that client relationships remained strong. For example:

- On Kraft Heinz's February 25, 2016 earnings call, Hees stated that the Company was supporting and would "continue to support strong levels of investment in R&D." On that same call, a Bank of America analyst asked Defendants whether growth was negatively impacted "as the cost savings – the margins start to expand." Hees denied that this was the case, reiterating the Company's strong investment in its brands: "**we are pushing this agenda of innovation, of go-to-market capabilities and higher marketing dollars** in a much faster pace than we did at [Heinz]."

- On that same call, Zoghbi told investors that Kraft Heinz's "working media" "will be growing by $50 million this year versus the prior year in the United States."

- On the Company's May 4, 2016 earnings call, Zoghbi affirmed Kraft Heinz's "strong relationship" with its customers based on its outstanding "service level," including high case fill rates: "So from a relationship with retailers, **we believe we have a very strong relationship, we have a positive relationship and we see a positive outlook there**. The most important things between us and our retailers in my discussion with many of them was whether we can maintain the

---

[2] "Fill rates" are the level of customer demand met through immediate stock availability, without backorders or lost sales.

service level up or not. And *we have demonstrated not only we can maintain the service level and the case [fill] rate, but we actually increased and we feel good about that*."

52.     Investors and analysts reacted positively to Defendants' statements trumpeting the Company's supposedly "sustainable" cost-cutting regime.  For example, in a February 26, 2016 report, BMO analysts applauded Defendants' statements that "KHC's operating efficiency strategy is not merely a cost cutting exercise."  In a May 5, 2016 report, UBS analysts highlighted the Company's "improving top-line stability," *i.e.*, stable sales, supposedly driven by "customer fulfilment rates (now 98%)."  That same day, Wells Fargo analysts wrote approvingly of "the steps [Kraft Heinz] management is taking, in terms of delivering a more on-trend innovation pipeline," and BMO analysts wrote that they were "increasingly encouraged by KHC's strategic initiatives beyond ZBB/cost cutting," because what Kraft Heinz promised "will create a more sustainable growth algorithm."  An August 30, 2016 Morgan Stanley report noted that "management has displayed an ability to balance aggressive cost reduction initiatives and sustainable topline growth."  Similarly, on November 4, 2016, Morningstar analysts observed that, "[m]anagement's rhetoric seems to support our stance on the importance of brand investments."

53.     As a result of Defendants' statements, Kraft Heinz stock soared in the quarters following the Merger.

**IV.    UNBEKNOWST TO INVESTORS, KRAFT HEINZ IMPLEMENTED DESTRUCTIVE AND UNSUSTAINABLE COST-CUTTING MEASURES THAT IMPAIRED THE COMPANY'S OPERATIONS AND DAMAGED ITS BRANDS**

54.     Unbeknownst to investors, the reality was quite different.  Under pressure to generate significant cost savings and report the promised earnings margins from the Merger, Defendants implemented across-the-board cost cuts that dramatically scaled back essential brand support and the performance and function of the Company's supply chain (*i.e.*, the network developed by the Company to supply, produce and distribute its product).  These cuts were

especially devastating because they came at a time when Kraft Heinz faced major threats to its core brands and products, as consumers were eschewing traditional staples like macaroni-and-cheese and bologna for fresher, less-processed and healthier options.

**A.    Cost Cuts to Kraft Heinz's Core Brand Support Functions**

55.    As Kraft Heinz's new leadership has now acknowledged, immediately after the Merger, Kraft Heinz implemented dramatic and debilitating cuts to core marketing, promotion, research and development ("R&D"), and other brand support functions, causing the value of the Company's once iconic brands to collapse.

56.    For example, Kraft Heinz made deep cuts to the Company's R&D operations, including the whole R&D department in Canada, and the vast majority of employees in the R&D group at the Tarrytown, New York facility.  After the Merger, Kraft Heinz terminated most of the employees who had the most knowledge about its coffee products even though the Company still had significant coffee brands to support, including *Maxwell House* coffee and *McCafé*-branded products.  Predictably, Kraft Heinz had to scramble when the Company had new coffee-related projects, because of the elimination of expertise and institutional knowledge.   In addition to reductions in headcount, Kraft Heinz cut R&D budgets, resulting in repeated failures to push new products following the Merger.

57.    Another way in which Kraft Heinz cut back on the core brand support functions was to cut back on product quality.  For example, rather than reformulating products to coincide with changing consumer tastes, the Company pushed cheaper materials into worse-tasting product reformulations to cut costs.  As a result of budget cuts, the Company sourced cheaper procurement materials and substituted cheaper ingredients based on the claim that they would make the product healthier.  Even core brands, like the *Oscar Mayer* brand, were affected by steps taken to decrease cold cut quality. For example, ham products had increased water weight, which decreased the

14

protein rate and made the product cheaper to produce. Likewise, blended meat products saw the proportion of cheaper proteins increase. This drop in quality had a direct impact on the Company losing business volume from customers like Walmart.

58. Kraft Heinz also cut back on the testing of new products. To keep market research costs low, the Company consolidated and cut relationships with vendors that provided customer insight, and instead relied increasingly on Nielsen data. However, Nielsen data provided did not include sufficient information as to customer preference and quality for Kraft Heinz to incorporate when trying to renovate its brands. In contrast, prior to the Merger, the former Kraft invested significantly in proprietary research and innovation.

59. Kraft Heinz also cut the amount that it spent on marketing its brands, causing further degradation to those brands. For example, from 2017 to 2019, the marketing budget for the Company's premium coffee brands was cut from nearly $30 million to under $2 million, resulting in revenues for the premium coffee brand dropping precipitously during the same period. Additional marketing resources designed to support the Company's sales force, like the "Center of Excellence," were also targeted by the cuts. Traditionally, the Center of Excellence played a role in many essential marketing tasks, such as focusing on new item execution to make sure new product samples and later shipments were delivered on time; supporting direct marketing to shoppers and in-store signage; and helping create the marketing material that the sales force used to convince retailers to carry new products.

60. As a result of the marketing cuts, the size of average marketing teams decreased from 20-25 people to around six people per team.

61. As another example of marketing cuts, the Company eliminated the use of trade dollars, an industry-standard form of rebate where a manufacturer provides retailers with discounts

15

and the retailer then uses the amount saved to promote the manufacturers' products in the store. A 5% to 7% trade dollar rebate was the norm. By eliminating these rebates, customers such as Walmart prioritized their shelf space for other products, including products from Kraft Heinz's direct competitors and from private label products.

### B. Cost Cuts to Kraft Heinz's Core Supply Chain Functions

62. Contrary to Defendants' public statements about the generation of efficiencies and synergies, Kraft Heinz implemented extensive cost cuts that created enormous supply chain disruptions.

63. For example, after the Merger, Kraft Heinz conducted indiscriminate layoffs that crippled the Company's R&D and supply chain. Kraft Heinz eliminated or nearly eliminated whole departments of personnel performing necessary jobs, including personnel in key manufacturing, product quality, and maintenance functions. In other instances, the Company replaced highly-experienced personnel with cheaper, but wholly inexperienced, finance personnel drawn from 3G Capital's own ranks, many of whom were no more than a few years out of college. The effect of these job eliminations and replacements was to remove deep institutional knowledge and expertise with respect to manufacturing, and disrupt long-standing client or supplier relationships.

64. Kraft Heinz also eliminated critical maintenance and product quality functions, such as cutting routine and preventative maintenance of machinery and equipment, which predictably led to major operational issues. Due to the cuts to maintenance and product quality monitoring, Kraft Heinz produced large amounts of mold-contaminated cheese at the Company's Springfield, Missouri Kraft Singles factory and its separate Velveeta cheese factory. This required shipments to be recalled when the mold was discovered later in the production and distribution process. Due to the cuts to routine and preventative maintenance, there was widespread equipment

failures, resulting in Kraft Heinz not being able to meet operational and production goals. All of this contributed to the impact on the Company's supply chain, causing serious issues such as low fill rates and delayed shipments.

65.     As another cost-cutting measure, Kraft Heinz implemented devastating and indiscriminate cost reductions that significantly cut back the quality and scope of services performed by longtime vendors and suppliers who had been integral to the respective supply chains at Kraft and Heinz prior to the Merger. For example, Kraft Heinz unilaterally changed payment terms with its vendors to significantly expand the timeframe for the Company to remit payment. Kraft Heinz also chose among its vendors based on price, regardless of product quality, performance record, reliability and service. These actions damaged long-standing relationships with the Company's largest and most reliable vendors and suppliers, who responded by de-prioritizing Kraft Heinz's needs. Smaller vendors who found that their cashflows were impacted in turn found themselves unable to timely provide goods and services to the Company. In this manner, these cost reductions were self-defeating, because Kraft Heinz depended on a steady supply chain from vendors and suppliers to timely provide goods and prevent a chain reaction of production slowdowns.

66.     As a further cost-cutting measure, Kraft Heinz closed key plants and distribution centers that provided essential capacity, but without implementing adequate replacements. For example, in November 2015, Kraft Heinz closed its Renée's Gourmet plant in the U.S., which manufactured salad dressings and other products. After the closure of the plant, Renée's Gourmet, which had ranked as the number one retailing food service salad dressing in Canada, lost significant ground to competitors. As another example, Kraft Heinz closed a distribution center in British Columbia, causing significant cost and delay on the Company's Canadian supply chain.

In the U.S., Kraft Heinz eliminated two of its three soup plants and then found the Company could not supply enough soup to customers. Thus, while the facility closures generated short-term savings for the Company, they negatively impacted its supply chain and its ability to fulfill customer orders. In other words, the cost savings derived from these closures were not sustainable and did not drive top-line growth.

67.     All of these cost cuts to core supply chain functions led to serious failures in filling and timely delivering orders, and reduced the Company's case fill rates, which remained significantly below internal Company standards after the Merger. In fact, the problem was so severe that Kraft Heinz's senior operations executives began holding daily "fill rate" meetings within weeks of the Merger. Because of the poor fill rates, the Company's customers (retailers) frequently threatened to pull Kraft Heinz products from their shelves.

### C.     Kraft Heinz Has Since Admitted The Damage Done To Its Brands And Supply Chain

68.     These across-the-board cuts ultimately had a destructive impact on the Company's brand equity and supply chain, and resulted in the $15.4 billion impairment of intangible assets revealed on February 21, 2019, and the loss of billions of dollars in shareholder value.

69.     As Kraft Heinz's new CEO, Miguel Patricio, later admitted in 2019, the Company had severely underinvested in its brands after the Merger. Patricio acknowledged that the Company had cut back on core media and promotion, impairing brand value: "we need to invest more, especially in our people and our brands . . . . *[O]ur media investments are below where they should be*." Patricio further acknowledged that the Company had underinvested in R&D, stating "*innovation is an area that we have to increase, we'll have to improve dramatically.*"

70.     Patricio further acknowledged that the Company's focus "on cost cutting" rather than on "efficiencies," and its undisclosed failure to "put into place an 'organic' process for

achieving ongoing productivity," led to "*supply chain losses [that] have been increasing, actually, double digits in the last years*" and "*pretty big disruptions in the past with our customers for—because of low service levels*." Indeed, Patricio admitted that Kraft Heinz had "*several problems in different types of products with our service level* . . . . [T]here are still scars from the past [and customers] questioned that if this is sustainable or not . . . *their number one concern, is really service level*." These problems were so glaring that, "*[f]rom day one*," Patricio "defined supply [chain] as a big area for improvement," in which Kraft Heinz would need to invest in "our people, in our factories" and "*change the mentality from basically cost-cutting into continuous improvement*."

71. Because of all these much-needed improvements identified by Patricio, the cost savings promised by Defendants were illusory. While Defendants publicly touted $1.7 billion in "sustainable" "synergies" and "efficiencies," Patricio told analysts that *virtually all of those savings* – approximately $1.5 billion – would need to be reinvested in the Company in order to revive its ravaged infrastructure. Moreover, Patricio stated, the Company would need to spend two years working on "stabiliz[ing] the business" before the Company could finally begin growing again *in 2021*. Therefore, to the extent that the "savings" were needed to remediate the damage inflicted by Defendants' devastating cost cuts in the first place, the "savings" were illusory.

72. Reports published by securities analysts after the Company admitted to the massive impairment of brand equity have reached the same conclusion. For instance, Credit Suisse analysts stated in a February 22, 2019 report that, "Anecdotal comments we hear from employees who left the company (and some who are still there) *consistently point to a corporate culture that is sweating its assets too hard*."

## V. THE SIGNIFICANCE OF KRAFT HEINZ'S GOODWILL AND TRADEMARKS

73.     One of the most straightforward means by which investors could assess the progress of Defendants' ZBB strategy, their success in creating synergies, savings and efficiencies from the Merger, and the impact these strategies had on the Company's brands, was to monitor the Company's own valuation of the fair value of its brands (trademarks) and goodwill.

74.     According to Kraft Heinz's 2017 Annual Report, filed on February 16, 2018, "[o]ur trademarks are material to our business and are among our most valuable assets." The value of these trademarks are recorded in the Company's balance sheet, primarily as "indefinite-lived intangible assets." According to the 2017 Annual Report, the Company's "indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.7 billion as of December 30, 2017."

75.     Another significant asset on the Company's balance sheet is "goodwill," a large amount of which was attributable to the Merger. As the 2017 Annual Report explains, "[t]he 2015 Merger resulted in $30.5 billion of non-tax deductible goodwill relating principally to synergies expected to be achieved from the combined operations and planned growth in new markets." According to the 2017 Annual Report, the value of the goodwill was divided among "18 reporting units and had an aggregate carrying value of $44.8 billion as of December 30, 2017."

76.     Given the material importance of the value of the Company's goodwill and trademarks/brands (indefinite-lived intangible assets), Kraft Heinz conducts annual testing, in the Company's second quarter, to determine if there are any impairments – that is, to determine if the fair value of the reporting units/trademarks is less than the value carried by Kraft Heinz on its books. According to the 2017 Annual Report:

> We test goodwill and indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We

performed our annual impairment testing in the second quarter of 2017. The first step of the goodwill impairment test compares the reporting unit's estimated fair value with its carrying value. If the carrying value of a reporting unit's net assets exceeds its fair value, the second step would be applied to measure the difference between the carrying value and implied fair value of goodwill. If the carrying value of goodwill exceeds its implied fair value, the goodwill would be considered impaired and would be reduced to its implied fair value. We test indefinite-lived intangible assets for impairment by comparing the fair value of each intangible asset with its carrying value. If the carrying value exceeds fair value, the intangible asset would be considered impaired and would be reduced to its fair value.

77.     As Kraft Heinz acknowledges in the 2017 Annual Report, one of the "Risk Factors" affecting the Company's business is that "[a]n impairment of the carrying value of goodwill or other indefinite-lived intangible assets could negatively affect our consolidated operating results."

## VI.     KRAFT HEINZ'S 2018 IMPAIRMENT TESTING

78.     For all of 2017, Kraft Heinz disclosed a total loss due to impairment of $48 million, which Kraft Heinz disclosed in its 2017 second quarter results.  In the Company's Form 10-Q for the 2017 second quarter, filed on August 4, 2017, Kraft Heinz stated that this loss was due to "continued declines in nutritional beverages in India. The loss was recorded in our Europe segment as the related trademark is owned by our Italian subsidiary."  However, "[e]ach of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017."

79.     On May 3, 2018, Kraft Heinz issued its Form 10-Q for the 2018 first quarter.  The 10-Q stated that "[o]ur goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.8 billion as of March 31, 2018."  Kraft Heinz stated that there were no impairments in the 2018 first quarter.  Kraft Heinz also stated that "[o]ur indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.8 billion as of March 31, 2018."  Again, Kraft Heinz stated that no events occurred during the 2018 first quarter that caused an impairment to the indefinite-lived intangible assets.

80. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

81. ██████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████     ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



82.

VII.

83.

84.

85.

86. ██████████████████████████████████████████████

87. ██████████████████████████████████████████████

88. ██████████████████████████████████████████████



89.

VIII.

90.

91.

92.

93. █████████████████████████████████████████

94. █████████████████████████████████████████

95.     Third, the information was material because it allowed investors to assess the trends affecting the Company.   Item 303 of Regulation S-K, 17 C.F.R. § 229.303, *Management's Discussion and Analysis of Financial Condition and Results of Operations*, requires a company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K, which states, in part:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

Item 7 of Form 10-K and Item 2 of Form 10-Q in turn require Kraft Heinz to furnish the information required to be disclosed under Item 303 of Regulation S-K.

96.     ███████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████  Investors were undoubtedly interested in these trends, because the trends allowed investors to assess whether the Company's ZBB cost-saving strategy was successful, whether synergies and efficiencies were being created as promised by Defendants, or whether the Company's strategy was in fact damaging the Company's brands.

97.     For example, during the February 21, 2019 earnings conference call for the 2018 full year and fourth quarter, Kenneth Goldman, an analyst from J.P. Morgan Equity Research, asked: "[M]ore importantly, you took a $15 billion write-down on 2 of your biggest brands, Kraft and Oscar Mayer. And to me, that literally means the brand equities there aren't what they used to be. So when investors are looking at the consistent financial disappointments at Kraft, maybe even bringing the eye into the discussion. And if they ask why -- if the 3G belt-tightening strategy goes

too far and if it damages brands, is there at least some evidence starting to point to yes there?" As a follow-up, Mr. Goldman asked: "David [Knopf], I think you mentioned that it was more of a short-term, like the last couple of quarter issue with the 2 brand[s] and maybe discount rates have risen. The companies generally don't take write-downs because recent performance was bad and because discount rates have risen. Isn't there something broader and longer term that usually leads to these kind of impairments?"



101.    On August 3, 2018, Kraft Heinz announced its 2018 2Q results. In the 2Q 2018 10-Q, Kraft stated with respect to its goodwill reporting units:

Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.3 billion as of June 30, 2018. We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $164 million in SG&A related to our Australia and New Zealand reporting unit. This impairment loss was primarily due to margin declines in the region. The goodwill carrying value of this reporting unit was $509 million prior to its impairment. Additionally, we noted that four of our 20 reporting units each had excess fair value over its carrying value of less than 10%. As of the impairment test date, the goodwill carrying values associated with these reporting units were $4.7 billion for Canada Retail, $424 million for Latin America Exports, $407 million for Northeast Asia, and $326 million for Southeast Asia.

102.    With respect to its trademarks, the 2Q 2018 10-Q stated:

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.4 billion as of June 30, 2018. We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $101 million in SG&A in the second quarter of 2018. This impairment loss was due to net sales and margin declines related to the Quero brand in Brazil. Additionally, as of April 1, 2018, two brands (ABC and Smart Ones) each had excess fair value over its carrying value of less than 10%. These brands had an aggregate carrying value of $665 million as of April 1, 2018.

103.



[REDACTED]

104. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

105. For example, in his prepared remarks, CEO and Defendant Bernardo Hees referred to the "encouraging, ongoing improvement in retail consumption trends in most countries and most categories as well as strong foodservice performance in a number of key countries." Hees stated that, "[i]n the United States, we saw consumption trends improve as Q2 unfolded, and as Planters' Club comparisons fade and as Ore-Ida and cold cuts activity and distribution improves, we're targeting top line growth in the third quarter."

106. In his prepared remarks, CFO and Defendant David Knopf stated that, "[a]s Bernardo outlined, we believe things are in place for us to push a more aggressive growth agenda in the second half from a strong innovation pipeline, distribution gains across channels, as well as expanding our brands into geographic whitespace." Knopf stated that, "[d]espite the slow start with several transitory headwinds and recent key commodity weakness in the U.S., we believe we're in a strong position to deliver organic growth for the full year." According to Knopf, "[i]n Canada, with near-term risks at play, it may be Q4 until we see the turn." CFO Knopf concluded

his prepared remarks by stating that, "[t]o close, I think it's worth repeating the thoughts that we've expressed all year: that we're developing capabilities to create brand and category advantage to achieve profitable growth; that we're investing aggressively now in order to see benefits sooner; and that these factors will shape our near-term results in 2018, and will drive sustainable profitable growth into 2019 and beyond."

107.    During the question-and-answer portion of the conference call, analyst Alexia Howard from Bernstein & Co. LLC asked: "You've obviously got some positive pricing that's running through now. How do you expect that to play out in the second half? And just how do you see the environment and the retailers' relationships playing out from here on out?"  Defendant Paulo Basilio answered: "So again, we believe that we have strong brands. We have differentiated products. We have a strong innovation pipeline and so far we've been able to drive our brands and products in line with what we perceive to be the value to the consumer …. So today, I can say that the relationship we have with customers are going very well and a very clear connection with all of them."

108.    Analyst Christopher R. Growe, from Stifel, Nicolaus & Co., Inc. asked: "You've had some weight on your sales from Planters and Oscar Mayer and Ore-Ida. I think you approached much easier comparisons on that front in the second half of the year. Is that right? You get past a lot of those issues in the second half? And do those shift to growth in the second half of the year as a result of that?"  Defendant Paulo Basilio responded: "I think that is one of the components, as we said. We are confident that we're expecting sales to grow in U.S. in the second half. I think one component that we are seeing is that you can see that our categories are improving, our categories now are growing. And on top of that, the big headwinds in share that you were seeing, these negative headwinds, we expect them to fade. I can give examples of cold cuts, Ore-Ida, lost

distribution that we have, the capacity restrictions we had. Now we have the capacity in place, so we expect to recover the distribution."

109.    Analyst David Palmer from RBC Capital Markets LLC asked: "You've listed a lot of reasons why sales were constrained in the first half in emerging markets, U.S., Canada, and separately you highlighted the analytics and sales investments. And to those two buckets I would add that in some key commodity categories like cheese, you've had some big volume declines. So I guess what I'm wondering is, going into the second half of the year, could you give some color about the reasons and timing for the sales recovery? Where will you see the sales improve earlier and where later?"  Defendant Paulo Basilio responded: "So first of all, we are seeing our categories improving, so our categories are running positive today. Many negative shares that we saw in the first half of the year are fading."  Defendant Basilio continued: "So it's pretty much just the combination of improvement in the categories, the negative headwinds that we have fading, investment in innovation and better programming that is giving us this confidence by the second half."

110.    Defendant Hees also responded, adding: "And, David, from a worldwide standpoint, we have Europe, Middle East and Africa continuing to grow with the same momentum they have in the first half of the year. We do see acceleration in Latin America especially after the strike event in Brazil in May, in June, July and moving forward we do see acceleration in some countries in Asia. … [W]e feel confident about the acceleration and the connection between the investment we announced in the beginning of the year and the results you're going to see in the top-line in the second half of the year, Q3, Q4 going into first half 2019."

111.    ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

## X. WHILE AWARE OF THE MATERIAL, NEGATIVE INFORMATION, 3G CAPITAL SOLD $1.23 BILLION OF STOCK.

112.    On August 7, 2018, four days after Kraft Heinz announced its 2018 second quarter results, and four days after their positive comments on the 2018 second quarter earnings conference call, the 3G Defendants sold 20,630,314 shares of the Company's stock at a price of $59.85 per share, generating sale proceeds of approximately $1.23 billion ("3G Sale").

113.    At the time of the 3G Sale, the 3G Defendants were aware of the material, negative information that had not been disclosed to (indeed, deliberately withheld from) investors on the August 3, 2018 conference call and in the 2Q 2018 10-Q. ████████████████████████

████████████████████████████████████████████

████████████████████████████████

## XI. DEFENDANTS' ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Defendants' Additional Misstatements And Omissions

114.    Apart from the material misstatements and omissions identified above in Section IX, Defendants issued a number of other materially misleading statements and omissions throughout 2018 concerning the sustainability of Kraft Heinz's cost cutting, the Company's ability to deliver additional "efficiencies," its relationship with key retailers, the status of its Canadian business, and Kraft Heinz's brand support and need for reinvestment.

*February 15, 2018 "Post-Integration Business Update"*

115.    After the market closed on February 15, 2018, Kraft Heinz issued an investor presentation, the "Post-Integration Business Update," and broadcasted that presentation through

the Investor Relations page on the Company's website. In that presentation, Knopf touted the

Company's "integration" savings:

> Our integration program delivered more than $1.7 billion of cumulative savings by the end of 2017 versus the $1.5 billion we originally expected. And we achieved that level of savings net of approximately $200 million of business investments to modernize and adapt our data, marketing, category management and go-to-market capabilities to the rapidly changing environment. For the total company, on a constant-currency basis, our EBITDA has grown by more than integration program savings. In other words, 100% of these savings flowed through to the bottom line.

Defendants also issued statements assuaging the market's concern about the sustainability of the

Company's cost-cutting practices and the adequacy of its brand investments.

116. Hees also assured investors that the Company's business model was "centering" on

"reinvest[ing] aggressively behind our brands":

> We are out to build an efficient company through a culture of ownership and meritocracy and *free up capital to reinvest aggressively behind our brands and business*. Product innovation and effective marketing are central pillars of our strategy and serve as growth drivers of our company. Our business plan is centering on building a highly scalable operating model based on data-driven decision-making, best-in-class in-house capabilities and a robust, repeatable ritual and routines organization. *Since the merger of Kraft Heinz in 2015, we have been investing and will continue to invest to build in-house capability in innovation in the organization, marketing, category management and go-to-market capabilities for better data-driven insights and faster decision-making*.

117. Finally, Knopf reassured, "We've delivered, exceeded or remain on track for every

commitment made at the time of our 2015 merger announcement. At the same time, we've been

investing in things that will drive sustainable, profitable growth going forward."

*February 16, 2018 Earnings Call*

118. On February 16, 2018, Kraft Heinz held an earnings call, during which, Defendants

made numerous misstatements.

34

119.    Significantly, analysts pressed Defendants for, and received, assurances that the Company's progress towards growth remained on track with its plans and that Kraft Heinz was not signaling weaknesses or inadequacies in its infrastructure or brand support.    A Bank of America analyst asked Defendants:

> Between last night's presentation and this morning it sounds like the world has changed a bit since 2012. There is some need to reinvest. Has this at all changed what you have thought about what the ongoing sort of EBITDA growth profile would have been for this business versus maybe what it was when Heinz and Kraft came together? Or is this just more of a temporary step back and you still have the same growth expectations going forward long-term?

In response, Hees denied that the Company had recognized a "need to reinvest" and responded that the Company was not signaling that it had fallen short of its internal goals and that it was only accelerating future investment:

> I don't think it's really changed our way of thinking. And as I said in the beginning of the presentation, *I think if you take the journey of Heinz since 2013 up to today, it's pretty much on track for the things we wanted to deliver and the progress we have made in the past that we have been delivering . . . .* And [those planned investments to grow the business are] exactly what we have been accelerating *since Q4 with the event of tax reform and having better free cash flow profile. And so, we did—took a decision to accelerate many of the categories and think that we have in mind that were in our timeline to EBITDA.*

120.    Knopf further emphasized that the Company's investments were not aimed at course-correction, but were instead opportunistic, adding, "We could have foregone the $250 million to $300 million of investment and grown at a faster clip this year. But as Bernardo said, we decisively chose to make these investments."

121.    Likewise, on that same call, a Jefferies analyst asked Defendants to confirm the assertions made in its February 15, 2018 Post-Integration Business Update presentation that the Company had already adequately invested in its infrastructure and that the additional investment was not compensating for any past underinvestment. The analyst asked, "*it seems from your*

*presentation yesterday that you think your capabilities already from a competitive perspective are better than most of your peers.* And so, it seems like this is an offensive move. But given the 2017 results have been sort of below potential perhaps the market might view this as more of a defensive move. So, I just wanted some clarification[.]" Zoghbi replied that the Company's investments were designed to *keep* its brands competitive, not make up for past underinvestment: "It's a defensive play to ensure that these brands stay relevant with consumer needs. And the creation of new brands like [Deval] or like other smaller brands that we created, they are one dimension brands that deal with one consumer need. These play the offensive part of the strategy."

122. Hees stated, "In Q4 we *accelerate[d]* commercial investments, particularly in marketing, in-store sales teams, e-commerce and supply chain. And this held back Q4 EBITDA in the United States." Hees also stated, "2.5 years since Kraft Heinz merger our journey *remains very much on track* and is set up for further organic gains going forward." Hees further stated, "Let me start by saying that I think at the end of 2017 we closed a chapter with the Kraft Heinz integration and after 2.5 years I think we are pleased to say that to *deliver [on] all our promises that were made at the time of the merger that you all follow closely*[.]"

123. A Goldman Sachs analyst sought reassurances from Defendants about the scope and character of the Company's investments and, in particular, that Kraft Heinz continued to have room to achieve incremental efficiency-oriented cost savings that would offset the investments: "Do you think that we are at a point where the investment may actually outweigh ongoing productivity? Or is there still surplus savings that allow you to fund some of this and drive underlying margin growth?" Knopf responded, "So, these are in fact new what you may call productivity initiatives, but effectively new savings initiatives that we are planning to implement this year. And these two benefits will really fund the investments for the year[.]"

124.    Defendants also touted the strength of their investment in Kraft Heinz's "brands and campaigns." Hees stated:

> If you think about the pillars we are highlighting in the framework and the investments David was just describing a couple of minutes ago, there is a lot of instore execution, a lot of digital initiatives, *a lot of working dollars behind brands and campaigns* . . . . Actually if you think about what's happening now, as many of our peers are retreating from touching the stores and investing in retailers, we are actually deciding to accelerate that, hiring more in-store execution, *putting more money behind our strength of our brands.* And that has a big component in the United States, a big component in Canada and a big component internationally.

125.    With respect to the Canadian business, Hees stated that any issues with the Company's Canadian customers arose from a mere delay in executing retail agreements that had already been resolved. Hees stated, "At Kraft Heinz we believe it's critical to take away clear learnings from the past year, and there were four key areas that held back our 2017 operational results. Number one is customer contracts. Here we've learned that having agreements in place signed and sealed at the start of the year can avoid first quarter commercial activation misses and lead to better retail execution for the balance of the year. This was the story of our Canadian and Russian business in 2017." Likewise, in response to a question from a Bernstein analyst, Knopf attributed a decline in quarterly revenue on "our Canadian business where, as we talked about in Q1 in 2017, *we were late to the game in really locking those agreements down*."

*May 2, 2018 Earnings Call*

126.    On May 2, 2018, Kraft Heinz held its first quarter 2018 earnings call with investors. On that call, Kraft Heinz's Credit Suisse analyst asked Defendants to describe the quality of Kraft Heinz's "relationships with trade." The analyst asked:

> Last year, there were a series of service issues on Ore-Ida, and then you also had some, I would say, some pushback from a major retailer on their pricing scheme for private label and Cheese and Meats. And then you had the Davenport issue. So is that – are all these issues kind of being resolved now? And do you feel like the retailers have given you a clean slate, and that's

> why you feel confident that you're seeing a bit of a tipping point here in terms of your distribution trends, your innovation trends and your programs? Or are those issues – weren't that big to begin with?

Basilio responded:

> So again, what I can tell you is that when you think about our service level for this year, we had a big improvement. As you know, the majority of the footprint work is now behind us. So again, *we started the year with a very good and strong service level*. We have this focus issue in capacity from Ore-Ida but decide that all our products and capacity we're delivering align what our customers they demand. So again, we still are going to experience some service constraint in Ore-Ida. But overall, *my total service level and the ability that we are seeing to engage with the customers, to get our innovation distribution, to get our products there, to get – to negotiate and set our JVPs are really well. So we're feeling good about this relationship for the year*.

127.    On the call, Defendants assured investors that Kraft Heinz continued to have room to achieve cost savings without impairing the Company's operations and, therefore, offset inflationary pressures and incremental investments. Hees stated, "And on costs, while inflationary pressures have continued across procurement, logistics and manufacturing, we viewed a solid pipeline of projects in each area to minimize these pressures, which should come through in the second half of the year. In other words, even though we substantially complete our Integration Program in Q4, *we remain in a strong position to both offset cost inflation and fuel high-return investments in our brand*."

128.    Knopf also assured investors that the Company had identified additional cost savings in the business and touted the Company's "aggressive" investments. Knopf stated, "[O]n the bottom line, our savings curve should catch up to inflation that we've seen in the business and the investments that we made in the business as the year progresses. So that's kind of, again, our breakdown for the year. And again, just to kind of reiterate what we said, the capabilities we're building in category management, brand building and go-to-market that we're investing this year

aggressively, this will benefit us both later into 2018 and will benefit us in 2019 and going forward."

129.    Hees touted "the ***investment and progress we are making to build capability for sustainable advantage to our iconic brands*** . . . . It's fair to say that ***we have spent the last two years on the necessary renovation for our portfolio, largely by focusing on marketing and efficiency and product renovation***. We are ***playing more offense with higher commercial investments***, especially behind incremental innovation."

130.    Defendants attributed Kraft Heinz's declining earnings and revenue growth to "***transitory factors***," including: "impact from retail inventory reductions in Canada" and "***accelerated*** investments . . . increasing working media dollars and best-in-class customer service."

*August 3, 2018 Earnings Call*

131.    On August 3, 2018, Kraft Heinz held its second quarter 2018 earnings call with investors. On that call, and in response to a Barclays analyst's question, Hees assured investors that Kraft Heinz's cost-cutting program was aimed at promoting efficiencies and did not sacrifice revenue growth for short-term margin expansion. Hees assured investors, "as we always said as well, we wouldn't hesitate to sacrifice one point of margin to generate accelerated growth on the top line." Further, Hees attributed Kraft Heinz's slowing earnings growth to "transitory factors," including "retail inventory change in Canada." *See also supra* at ¶¶ 104-111.

132.    In direct response to further analyst questioning, Defendants continued to state that the Company's investments were not compensating for past underinvestment, but opportunistically accelerating future planned investment. A Consumer Edge Research analyst asked, "How much of these capabilities investments have a return that we can measure in 2019,

2020? . . . [T]hese investments you're talking about, are these really just increases in the cost of competition?" Hees responded, "The way to see that, and if you think about what we did, was not really a change on the plans we had [sic]. We knew the capabilities were there and we knew what to do. We took advantage of a better scenario we had in the United States from a free cash flow standpoint. And we did accelerate the plans we had from a commercial standpoint to drive those capabilities, right? So it's not something that was new to us."

*September 5, 2018 Barclays Global Consumer Staples Investor Conference*

133.     On September 5, 2018, Defendant Hees attended the Barclays Global Consumer Staples investor conference on behalf of Kraft Heinz.  At that conference, Defendants stated that Kraft Heinz's cost-cutting measures were aimed at generating "efficiency," geared towards "the long run," and investing – not cutting – in the consumer-facing parts of the business.  Moreover, Defendants assured investors that the Company continued to have room to achieve further "synergi[stic]" cost savings.  Hees stated:

> When you think about ZBB and the whole efficiency mentality we have, it's much more a way of doing things and thinking as owners for the long run so we can fuel those savings to places where consumers are. And we'll continue to do that for the foreseeable future. There is no end to that. For sure, the buckets of things we had during the transaction to today are different, right? But we don't see that as an end, there is no more synergies. Synergy will continue to flow, just in a different magnitude, yes.

*November 1, 2018 Earnings Call*

134.     After the market close on November 1, 2018, Kraft Heinz held its third quarter 2018 earnings call with investors. On that call, Defendants continued to characterize Kraft Heinz's inability to deliver cost savings and stepped-up brand investment as "one-off" headwinds.  Hees stated that "third quarter profitability was held back by several ***one-off factors***, including commercial investment" and "our decision to prioritize customer service as we saw volumes ramp up and forego some degree of profitability in the ***short term***."  On that same call, in response to an

analyst question about why "there's not ultimately the need for another significant step-up" in Kraft Heinz's commercial spending, Hees replied, "I think the numbers are already in our base. We are not seeing the reason to increase that into 2019."

135.    Knopf likewise stated that the Company's performance had been "dominated by a number of *transitory issues* on both the sales and cost sides of the equation that we do not expect to repeat . . . . Going forward, we feel good about our ability to continue driving commercial growth and our ability to drive EBITDA dollar growth and industry-leading margins as one-off factors fall away and the contribution from our savings initiatives accelerate."

136.    Basilio further emphasized that the Company's investment in price cuts, in particular, was transitory: "We believe that we have a very strong portfolio of brands with ability to price as we've been showing over the past several quarters, as we mentioned."

137.    Defendants further assured investors that the Company's Canadian operations were strong with a robust pipeline of planned activity. Knopf stated that Canadian sales were held back by "activity that were not repeated," such as "higher promotional expenses in the current year as well as comparisons with prior year, [and] limited-time condiment offers." Nevertheless, Knopf stated, "As we mentioned on our last call, however, we do expect a solid pipeline of activities to return Canada to growth in Q4."

**B.    Defendants' Statements Were Materially False And Misleading**

138.    Defendants' statements above were materially false and misleading when made.

139.    First, Contrary to Defendants' statements about the impact of Kraft Heinz's cost savings and about Kraft Heinz's ability to generate additional sustainable cost savings, the Company's cost savings efforts were actually harming business. Specifically, Kraft Heinz implemented across-the-board cost cuts that dramatically scaled back essential brand support and supply chain performance and function. Kraft Heinz did the very opposite of what Defendants

stated the Company was doing by sacrificing long-term growth for short-term margin expansion in order to keep Kraft Heinz's share price high.

140.    Moreover, contrary to Defendants' statements, including those touting the Company's "very good and strong service level" and its relationship with customers, Kraft Heinz's cost-cutting measures caused dramatically reduced productivity, service quality, distribution, and ultimately, loss of significant business, including loss of key customer contracts in late 2016.  As a result, far from "100% of these savings flow[ing] through to the bottom line," Defendants were well aware that Kraft Heinz would be required to reinvest, and indeed, had already begun reinvesting, those supposed "savings" in order to repair the serious damage caused by Defendants' reckless and indiscriminate cost cutting.

141.    In short, Defendants' statements concerning cost savings were materially false and misleading because, soon after the Merger, Kraft Heinz lost the ability to wring any cost savings out of the Company without severely impairing the business, let alone deliver savings that would promote efficiency.

142.    Second, Defendants' statements concerning Kraft Heinz's disappointing performance in its Canadian retail business were materially false and misleading.  Contrary to the reasons offered by Defendants, and as a result of Kraft Heinz's undisclosed cost-cutting and other improper practices, the Company's most important Canadian customers terminated preferred volume agreements that guaranteed Kraft Heinz significant sales volume, and instead entered into far less favorable "order-as-needed" arrangements.

143.    Third, Defendants' statements touting Kraft Heinz's investments in the Company's brands, operations and infrastructure were materially false and misleading.  Defendants omitted the highly material facts that, far from "free[ing] up capital to reinvest aggressively behind our

brands and business," and contrary to Defendants' statements that innovation and marketing were "central pillars" of the Company's strategy, Kraft Heinz made dramatic cuts to media spend, including working media; eliminated important distribution tools, including providing trade dollars to customers; and virtually eliminated the Company's R&D function through massive layoffs and crippling budget cuts. Likewise, Defendants severely cut back core supply chain functions causing dramatically reduced productivity, service quality and distribution. Contrary to Defendants' statements, these cuts seriously impaired the Company's innovation, marketing, and "go-to-market capabilities."

## XII. THE TRUTH IS FINALLY REVEALED, CAUSING KRAFT HEINZ'S STOCK PRICE TO PLUMMET

144. Just three months after the August 7, 2018 3G Sale, Kraft Heinz's stockholders began to learn the truth about Kraft Heinz's financial performance.

145. On November 1, 2018, Kraft Heinz reported adjusted earnings-per-share of $0.78 per share, which fell short of consensus estimates by nearly 4%. Kraft Heinz reported adjusted EBITDA that missed analysts' consensus estimates by approximately $100 million, or 7%.

146. In its Form 10-Q for the 2018 third quarter, filed on November 2, 2018, Kraft Heinz disclosed some of the negative trends impairing the carrying value of its reporting units/trademarks. Specifically, the Company disclosed: "In the third quarter of 2018, we recognized a non-cash impairment loss of $215 million in SG&A related to the *Smart Ones* brand. This impairment loss was primarily due to reduced future investment expectations and continued sales declines in the third quarter of 2018." ████████████████████████████ ████████████████████████████████████████████████████ The Form 10-Q also stated: "No events occurred during the period ended September 29, 2018 that indicated it was more likely than not that our other indefinite-lived intangible assets were impaired." Similarly,

Kraft Heinz stated: "No events occurred during the period ended September 29, 2018 that indicated it was more likely than not that our goodwill was impaired." ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████

147.    In response to the Company's third quarter earnings announcement, the price of Kraft Heinz common stock fell $5.47 or 9.7%, from $56.20 per share on November 1, 2018, to $50.73 per share at the close of trading on November 2, 2018.

148.    On February 21, 2019, just six months after the 3G Sale, Kraft Heinz revealed the full scope of the impairments and negative trends affecting its business.  On that day, after the market close, Kraft Heinz announced its financial results for the fourth quarter and full year 2018. The Company reported organic net sales growth of 2.4%, with an "adjusted" EPS of $0.84, which was $0.10 below consensus estimates, as well as revenues $50 million below consensus expectations.

149.    Importantly, Kraft Heinz announced that it had recorded a ***$15.4 billion*** impairment charge against its goodwill and trademarks.  The Company stated:

> During the fourth quarter, as part of the Company's normal quarterly reporting procedures and planning processes, the Company concluded that, based on several factors that developed during the fourth quarter, the fair values of certain goodwill and intangible assets were below their carrying amounts. As a result, the Company recorded non-cash impairment charges of $15.4 billion to lower the carrying amount of goodwill in certain reporting units, primarily U.S. Refrigerated and Canada Retail, and certain intangible assets, primarily the *Kraft* and *Oscar Mayer* trademarks.

150.    █████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████

151.    As a result of these charges, Kraft Heinz reported a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.  Based on the above poor performance, the Company announced it was lowering its quarterly dividend by $0.225 to $0.40 per share.

152.    On this news, the price of Kraft Heinz common stock fell $13.23 per share, or almost 28%, from a close of $48.18 per share on February 21, 2019, to close at $34.95 per share on February 22, 2019, erasing *$16.1 billion* in market capitalization.

153.    On March 1, 2019, Kraft Heinz received a subpoena from the SEC related to the Company's assessment of goodwill and intangible asset impairments and related matters.

## DERIVATIVE ALLEGATIONS

154.    Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty and other breaches by Defendants.

155.    Plaintiff has owned Kraft Heinz stock continuously during the time of the wrongful course of conduct by the Defendants alleged herein and continues to hold Kraft Heinz stock.

156.    Plaintiff will adequately and fairly represent the interests of Kraft Heinz and its stockholders in enforcing and prosecuting the Company's rights.

## DEMAND ON THE BOARD IS EXCUSED BECAUSE IT IS FUTILE

157.    Plaintiff has not made a demand on the Kraft Heinz Board to bring a lawsuit asserting the claims set forth herein because pre-suit demand is excused as a matter of law.

158.    A majority of the Board is either interested in the transactions that are challenged and in the claims asserted, or suffer from conflicts of interest and divided loyalties.  The Board is therefore incapable of impartially considering a lawsuit with respect to the claims alleged herein, and demand is excused.

159.     The Kraft Heinz Board currently consists of eleven directors: Alexandre Behring; John T. Cahill; Gregory Abel; Joao M. Castro-Neves; Feroz Dewan; Jeanne P. Jackson; Timothy Kenesey; Jorge Paulo Lemann; John C. Pope; Alexandre Van Damme; and George Zoghbi. With respect to each of the three claims for relief asserted by Plaintiff (*see infra*, Claims for Relief), there is not a majority of the Board that is disinterested or independent.

## I.     COUNT I:  INSIDER TRADING AND MISAPPROPRIATION OF CORPORATE INFORMATION

160.     As alleged below, Plaintiff asserts Count I against the 3G Defendants for selling Kraft Heinz stock on August 7, 2018 in breach of their fiduciary duties. With respect to this claim, there is not a majority of the Board that is disinterested or independent.

### *Directors Behring, Castro-Neves And Lemann Are Conflicted*

161.     Director Behring is a co-founder of 3G Capital, and has been its managing partner and a director of 3G Capital's board since 2004. Director Castro-Neves has been a partner of 3G Capital since July 2018. Director Lemann is a co-founder of 3G Capital, and has served as a director of 3G Capital's board since 2004. Because they are the representatives of 3G Capital on Kraft Heinz's Board, these three directors are interested in the 3G Sale made by the 3G Defendants.

### *Directors Abel And Kenesey Are Conflicted*

162.     According to Kraft Heinz's 2019 Proxy, filed on August 2, 2019, Director Abel was "selected by Berkshire Hathaway" to "serve on the initial Board of Directors of Kraft Heinz" upon the Merger. According to the 2019 Proxy, "[s]ince January 2018, Mr. Abel has served as Vice Chairman, Non-Insurance Operations and Director of Berkshire Hathaway Inc., a diversified holding company. Mr. Abel is Executive Chairman of the Board of Berkshire Hathaway Energy Company. He previously served as Chairman of Berkshire Hathaway Energy Company since 2011 and Chief Executive Officer and President since 2008 and 1998, respectively."

163.    Director Kenesey joined the Board on January 24, 2020, replacing Berkshire Hathaway's previous Board designee, Tracy Britt Cool.  Kenesey is President and Chief Executive Officer of Berkshire Hathaway's MedPro Group, the nation's largest healthcare liability insurance company, where he has served since 2001. Mr. Kenesey has also served as the Chairman of Fechheimer Brothers, a Berkshire Hathaway public safety uniform and apparel company, since 2007, and the chairman of other smaller Berkshire Hathaway insurance subsidiaries.

164.    As Berkshire Hathaway's appointees on the Board, Abel and Kenesey lack independence from 3G Capital and its director appointees on the Board.  As alleged above, in 2013, 3G Capital (through its affiliated entities) and Berkshire Hathaway partnered together to acquire Heinz.  In 2015, 3G Capital and Berkshire Hathaway teamed up again to merge Heinz with Kraft.  According to the 2019 Proxy, "[u]pon the closing of the Merger, 3G Capital and Berkshire Hathaway entered into a shareholders' agreement that governs how each party and its affiliates vote the shares of Kraft Heinz common stock held by them with respect to supporting certain directors who are nominated by the Board and designated for support by either 3G Global Food Holdings or Berkshire Hathaway."  As described in the 2019 Proxy:

> Pursuant to the shareholders' agreement, 3G Global Food Holdings agrees that for so long as Berkshire Hathaway and its affiliates control shares representing at least 66% of the voting power in election of directors of shares owned by Berkshire Hathaway as of the consummation of the Merger, 3G Global Food Holdings and its affiliates will vote their shares of Kraft Heinz common stock in favor of the three Kraft Heinz Board nominees designated by Berkshire Hathaway (two directors if they own less than 66% but at least 33% of the voting power and one director if they own less than 33% but at least 15% of the voting power) and will not take any action to remove such designees without Berkshire Hathaway's consent. Similarly, Berkshire Hathaway agrees that for so long as 3G Global Food Holdings and its affiliates control shares representing at least 66% of the voting power in elections of directors of shares owned by 3G Global Food Holdings as of the consummation of the Merger, Berkshire Hathaway and its affiliates will vote their shares of Kraft Heinz common stock in favor of the three Kraft Heinz Board nominees designated by 3G Global Food

Holdings (two directors if they own less than 66% but at least 33% of the voting power and one director if they own less than 33% but at least 15% of the voting power) and not take any action to remove such designees without 3G Global Food Holdings' consent.

165.     Because of their partnership to acquire Heinz and then to merge with Kraft under the Merger, and because of the shareholders' agreement that 3G Capital and Berkshire Hathaway executed in connection with the Merger, Berkshire Hathaway and its two nominees on the Board, directors Abel and Cool, lack independence from 3G Capital and/or are interested in the 3G Sale.

166.     As Berkshire Hathaway's appointees on the Board, Abel and Kenesey also lack independence of 3G Capital and its director appointees on the Board because of the close relationship generally between the controlling shareholders/founders of Berkshire Hathaway and 3G Capital, respectively. Warren Buffett is Berkshire Hathaway's Chief Executive Officer and Chairman of its board of directors. He is also Berkshire's largest shareholder and owns shares of Berkshire that represent approximately 31.4% of the voting interest and 16.5% of the economic interest. Berkshire Hathaway's proxy statements state that Mr. Buffett may be deemed to be Berkshire Hathaway's controlling shareholder. Mr. Buffett has a very close friendship with 3G Capital's co-founder, Lemann. Buffett and Lemann have known each other since 1998, when they met while serving together on Gillette's board of directors. According to the book *DREAM BIG: How the Brazilian Trio behind 3G Capital – Jorge Paulo Lemann, Marcel Telles and Beto Sicupira – acquired Anheuser-Busch, Burger King and Heinz* ("*Dream Big*"), which includes an account of the author's private interview with Buffett, Lemann and Buffett are "longstanding friends" who have a "close relationship" and a "firm friendship." They share the same lifestyle, working habits and ambitions. Buffett affectionately refers to Lemann as "Georgie." Buffett and Lemann are "so close that Buffett has accompanied Lemann to three workshops with Jim Collins[, a business professor and mentor of Lemann,] in Colorado in recent years." According to *The Wall Street*

*Journal*, Buffett flew out to Harvard University to attend Lemann's 75th birthday party.  As reported by *The New York Times* in 2017, Buffett said of Lemann: "I consider it one of the largest mistakes in my life that we didn't really team up as partners until considerably later…."  Even in the wake of KHC's announcement of the $15.4 billion impairment charge, Buffett publicly backed Lemann and 3G Capital, affirming that Berkshire Hathaway would still pursue future co-investments with 3G Capital, and calling Lemann "a good friend" and "an absolutely outstanding human being."

167.    Because of the close social and personal relationship between Warren Buffett and Lemann, the two Berkshire Hathaway appointees on Kraft Heinz's Board, Abel and Kenesey, lack independence from 3G Capital and/or are interested in the 3G Sale.  Both Abel and Kenesey are longtime Berkshire Hathaway executives who owe their livelihoods and careers to Berkshire Hathaway and answer to Mr. Buffett, who is the CEO of Berkshire Hathaway, the chairman of its board, and its controlling shareholder.  Abel and Kenesey cannot be expected to impartially consider a lawsuit against the 3G Defendants when that would effectively be suing Mr. Buffett's friend.

### *Director Zoghbi Is Conflicted*

168.    Director Zoghbi also lacks independence from 3G Capital (and the other 3G Defendants) because he is employed as an officer by Kraft Heinz, with the title of "Special Advisor."  According to the 2019 Proxy, effective January 1, 2017, the Company entered into an offer letter (the "Offer Letter") to incentivize Zoghbi to extend his service with the Company past January 1, 2017.  Under the Offer Letter, Zoghbi: (i) was paid a base salary of $850,000; (ii) agreed to a 2017 target annual incentive award opportunity of 200% (with a maximum bonus multiplier of 130%); and (iii) was granted a long-term equity incentive award.  According to the 2019 Proxy,

the long-term equity incentive award was composed of (i) RSUs, which "cliff vest" after three years, and (ii) PSUs, which "cliff vest" after three years based on the achievement of U.S. sales growth targets and U.S. adjusted EBITDA growth targets.  In October 2017, Zoghbi transitioned from his role as President of the Company's U.S. Commercial business to his current role as "Special Advisor."  As expressly stated in the 2019 Proxy, "Mr. Zoghbi is an employee of Kraft Heinz. For as long as Mr. Zoghbi continues to serve as a Special Advisor at Kraft Heinz, it is anticipated that he will not receive compensation for his services as a director."  Effective July 1, 2019, Zoghbi's base salary was $400,000 annually.

169.    Because Zoghbi does not get paid for his service as director and because he is instead employed and compensated as an officer ("Special Advisor") of Kraft Heinz, Zoghbi is beholden to all the other senior officers of Kraft Heinz – specifically, former CEO Hees, current CEO Miguel Patricio, CFO Knopf, and Chief Business Planning and Development Officer Paulo Basilio – all of whom are appointees of 3G Capital and are Zoghbi's superiors and/or colleagues. Zoghbi therefore lacks independence vis-à-vis 3G Capital.  In addition, the 2019 Proxy notes that the Board determined that, for purposes of the NASDAQ listing standards' "independence" requirements, Zoghbi was not independent.

### *Director Van Damme Is Conflicted*

170.    Director Van Damme lacks independence from 3G Capital (and the other 3G Defendants) because of his board memberships, business dealings and social relationships.  In 2004, Brazil's AmBev and Belgium's Interbrew announced a two-stage merger to create the world's largest brewer by volume.  The controlling shareholders of Ambev were three investment bankers, Defendants Lemann and Telles, and an individual named Carlos Alberto da Veiga Sicupira.  The controlling shareholders of Interbrew were three Belgian families, including the

family of Defendant Van Damme. Defendant Van Damme had spent many years working in the family business, including as strategy head of Interbrew. The three families controlled Interbrew through a trust, Stichting Interbrew, that controlled 63.7% of the voting rights of Interbrew. Under the merger, the controlling shareholders of Ambev swapped their shares in Ambev for newly-issued shares in Interbrew, and then placed those shares in Stichting Interbrew. As a result of the merger, Stichting Interbrew eventually owned 70% of voting rights in the newly-merged entity, called InBev.

171. From 2004 to 2008, Van Damme served on the InBev board of directors alongside 3G Capital founding partners and directors, and fellow current or former KHC Board members, Behring, Lemann and Telles, as well as 3G Capital founding partner and director Sicupira.

172. Van Damme has known Telles since 1995, when they met at Lazard Freres's offices while on beermaking business. Van Damme has known Lemann since early 2002, when Telles introduced Lemann to Van Damme at a breakfast meeting. That meeting sparked an intimate friendship between Lemann and Van Damme. In fact, Lemann and Van Damme are so close that they have watched the samba schools together at the Rio Carnival, summered together with their respective families in the Hamptons, and visited each other in the Swiss Alps. According to *Dream Big*, by May 2003 (when Lemann first proposed a merger of AmBev and Interbrew), Van Damme was "virtually an ally of Lemann." Van Damme sponsored the AmBev proposal to the three Belgian Interbrew families. According to *The Guardian*, "Megabrew takeover – a tale of beers, billions and bluebloods" (October 9, 2015), Van Damme "has a powerful voice and is closer to the Brazilians. … Reports have suggested that the [three Belgian] families disagreed over InBev's aggressive pursuit of family-led Anheuser-Busch [in 2008], with Van Damme siding with the

Brazilians to force the US brewer into a deal." Van Damme and Lemann have remained friends for nearly two decades.

173. Since December 2014, Van Damme has served on the board of directors of Restaurant Brands International Inc. ("RBI"), the parent company of Burger King, Popeyes, and Tim Hortons. Van Damme previously served on the board of Burger King Worldwide, Inc. and its predecessor (collectively, "Burger King") from December 2011 to December 2014. As a director of RBI and previously Burger King, Van Damme has worked with and is friendly with the 3G Defendants, because RBI is controlled by 3G Capital, with Defendant 3G Capital Partners Ltd currently owning 32.1% of RBI. For example, Defendant Behring (a founding partner of 3G Capital) is the Executive Chairman of the RBI board of directors, and, like Van Damme, also previously served on the board of Burger King as chairman from October 2010 until December 2014. Director Castro-Neves (a partner of 3G Capital) also serves on the Board of RBI. According to *Dream Big*, Van Damme invested in the 3G Capital funds that acquired Burger King in 2010, as well as the 3G Capital funds that invested in Heinz in 2013.

174. Van Damme is also connected to Defendant Behring through their service on the board of directors of AB InBev, formed from the 2008 merger of InBev with Anheuser-Busch. Van Damme has served as a member of the board of directors of AB InBev and its predecessor entities since 1992. Defendant Behring served as a director of AB InBev from April 2014 to April 2019.

175. Van Damme also has connections to 3G Capital and its principals through his charitable interests. Van Damme serves on the board of DKMS, a charitable organization. Since at least 2016, 3G Capital and its principals have been intimately involved in fundraising efforts for DKMS. In 2016, AB InBev was a "Visionary Sponsor," and 3G founding partners Behring and

Roberto Thompson Motta were co-chairs and "Diamond Sponsors," of DKMS's annual Love Gala, the largest annual fundraising event for DKMS. In 2017, Behring and Motta served as "Platinum Sponsors," and Telles as a "Gold Sponsor," of the Love Gala, with Behring and Motta again co-chairing the event. In 2019, Behring, Lemann and Motta were "Platinum Sponsors" of the Love Gala, and Behring and Motta once again co-chaired the event.

176. Based on the above financial relationships between the Van Damme family and the 3G Capital partners Lemann and Telles, the common board memberships of Van Damme and a number of representatives of the 3G Defendants, and the social relationships and friendships between Van Damme and Lemann, Behring and Telles, Van Damme cannot impartially consider a demand to bring a lawsuit against the 3G Defendants.

### *Director Cahill Is Conflicted*

177. Director Cahill cannot disinterestedly and independently consider a demand to prosecute Count I against the 3G Defendants because he is beholden to, and not independent of, the 3G Defendants. As disclosed in the Company's Form 10-K, filed with the SEC on June 7, 2019 (the "2019 10-K"), Kraft Heinz (while under the control of 3G Capital and Berkshire Hathaway) entered into a consulting agreement with Cahill on November 2, 2017 (the "2017 Consulting Agreement"). The 2017 Consulting Agreement paid Cahill a $500,000 salary in return for advisory and consulting services. The 2017 Consulting Agreement expired on July 1, 2019. Prior to the 2017 Consulting Agreement, and in connection with the Merger, Kraft Heinz had entered into another consulting agreement with Cahill which expired in July 2017 (the "2015 Consulting Agreement"). In light of the 2017 Consulting Agreement, and NASDAQ Listing Rules, the Kraft Heinz Board determined that Cahill (along with Zoghbi) are "not independent." In addition to the 2017 Consulting Agreement and 2015 Consulting Agreement, Cahill is beholden

to 3G Capital and Berkshire for bestowing upon Cahill a $19.9 million payout as a result of the Merger after just serving as CEO for just five months.[3]

178.    Additionally, Cahill's son, Jack Cahill, works as a District Sales Manager at AB InBev, which is controlled by 3G Capital co-founders Lemann, Telles and Sicupira with their co-investors.  From his biography posted on LinkedIn, Jack Cahill appears to have started his career at AB InBev as a member of its highly selective management trainee program.  According to *Dream Big*, AB InBev received 74,000 applications for its management trainee program in 2012, out of which only 24 applicants were hired. Telles – a 3G Capital cofounder, a self-described "controlling shareholder" of AB InBev, and Cahill's fellow Kraft Heinz Board member until July 2019 – apparently hand-picked Jack Cahill to join AB InBev's management trainee program. According to *Dream Big*, Telles remains intimately involved in the selection of trainees: "Even though Telles is no longer involved in the daily running of the company [AB InBev], he still takes part in the final selection of the trainee program and tells those chosen that they can send him messages directly should they feel necessary."

179.    Due to these relationships, Cahill could not objectively and impartially consider a demand to pursue litigation against 3G Capital.  Acting against 3G Capital's interests, including by agreeing to prosecute the claims alleged herein, would pit Cahill against his prior benefactors, as well as jeopardize Cahill's son's employment with 3G Capital, and Cahill's potential to secure another consulting arrangement from Kraft Heinz.

---

[3] Crain's Chicago Business, "A $19.9 Million Golden Parachute For Kraft's Cahill," May 18, 2015, available at:
https://www.chicagobusiness.com/article/20150518/NEWS07/150519821/kraft-s-cahill-due-19-9-million-parachute-from-5-months-as-ceo.

180.    As such, at least eight of the eleven members of Kraft Heinz's Board are interested or lack independence for purposes of the 3G Sale that is challenged under Count I.  Demand on the Board is therefore excused with respect to Count I.

*Directors Abel, Behring, Cahill, Dewan, Jackson, Lemann, Pope,*
*Van Damme and Zoghbi Are Additionally And Independently Conflicted*

181.    In addition to the specific conflicts described above, nine of the directors currently on the Board (Abel, Behring, Cahill, Dewan, Jackson, Lemann, Pope, Van Damme and Zoghbi) lack independence and/or are interested vis-à-vis the 3G Sale for the additional reason that they face liability under Count II alleged below.  The underlying allegations with respect to Count II are the same as the underlying factual allegations with respect to Count I.  ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████  As such, the nine current directors of the Board sued under Count II cannot impartially consider bringing a lawsuit with respect to Count I.  To do so would be to acknowledge their own liability under Count II.

182.    Therefore, for this additional reason, nine of the current directors of the Board are interested or lack independence for purposes of the 3G Sale that is challenged under Count I. Demand on the Board is therefore excused with respect to Count I.

## II.    COUNT II:  ISSUING MISLEADING STATEMENTS AND OMISSIONS

183.    As set forth below, Plaintiff asserts Count II against the officers Hees, Basilio and Knopf, and the directors Abel, Behring, Cahill, Cool, Dewan, Jackson, Lemann, Pope, Telles, Van Damme and Zoghbi.

184.     Nine of the current eleven directors of the Board – Abel, Behring, Cahill, Dewan, Jackson, Lemann, Pope, Van Damme and Zoghbi – are Defendants under Count II and face a substantial likelihood of liability for misleading stockholders in approving and disseminating the 2Q 2018 10-Q.  As such, these nine directors are interested with respect to Count II.

185.     In addition, directors Behring, Castro-Neves, Lemann, Abel, Cahill, Kenesey, Van Damme and Zoghbi, are interested and/or lack independence with respect to 3G Capital, for the reasons alleged above in paragraphs 162 to 182.  Therefore, these eight directors cannot impartially consider bringing a lawsuit against the officers Hees, Basilio and Knopf under Count II, because these three officers are all partners of 3G Capital.

186.     Because at least nine of the eleven members of Kraft Heinz's Board are interested and/or lack independence for purposes of Count II, demand on the Board is excused with respect to Count II.

## III.    COUNT III:  RIGHT TO CONTRIBUTION

187.     As set forth below, Plaintiff asserts Count III against Defendants Hees, Basilio, Knopf, Behring and Zoghbi for contribution under Section 21D of the Exchange Act, 15 U.S.C., § 78u-4(f).

188.     Directors Behring and Zoghbi are therefore interested for purposes of Count III because they are directly liable under Count III.

189.     In addition, directors Behring, Castro-Neves, Lemann, Abel, Cahill, Kenesey, Van Damme and Zoghbi, are interested and/or lack independence with respect to 3G Capital, for the reasons alleged above in paragraphs 162 to 182.  Therefore, these eight directors cannot impartially consider bringing a lawsuit against Defendants Hees, Basilio, Knopf and Behring under Count III, because these individuals are all partners of 3G Capital.

190. Because at least eight of the eleven members of Kraft Heinz's Board are interested and/or lack independence for purposes of Count III, demand on the Board is excused with respect to Count III.

## CLAIMS FOR RELIEF

## COUNT I

**(Against The 3G Defendants For Breach Of Fiduciary Duties For Insider Trading And Misappropriation of Information)**

191. Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

192. Plaintiff brings this claim against the 3G Defendants.

193. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

194. The information described above was proprietary non-public information material to the Company's financial condition and future business prospects. It was a proprietary asset of the Company, which the 3G Defendants used for their own benefit when they sold Kraft Heinz common stock.

195. The 3G Defendants made the 3G Sale because they were motivated, in whole or in part, by the substance of the above material, non-public information.

196.    In making the 3G Sale, the 3G Defendants breached their fiduciary duties.

197.    Kraft Heinz is entitled to the disgorgement of any profits made or any losses avoided by the 3G Defendants as a result of the 3G Sale.

## COUNT II

**(Breach Of Fiduciary Duty For Issuing
Materially Misleading Statements And Omissions)**

198.    Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

199.    Defendants Hees, Basilio, Knopf, Abel, Behring, Cahill, Cool, Dewan, Jackson, Lemann, Pope, Telles, Van Damme and Zoghbi are hereinafter individually and collectively defined as the "Disclosure Defendants."

200.    Plaintiff brings this claim against the Disclosure Defendants.

201.    As alleged in paragraphs 104 to 111, Disclosure Defendants Hees, Basilio and Knopf participated in the August 3, 2018 conference call and made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the surrounding circumstances, not misleading. ███████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████    Instead, Defendants discussed other trends, without mentioning the most serious trends threatening impairment of the Company's most valuable assets, and even made statements suggesting improved performance in some of the Company's key brands.

202.     In addition, as alleged in Sections III and XI, Disclosure Defendants Hees, Basilio and Knopf made numerous other materially false statements and omissions concerning the sustainability of Kraft Heinz's cost cutting, the Company's ability to deliver additional "efficiencies," its relationship with key retailers and the status of its Canadian business, and Kraft Heinz's brand support and need for reinvestment.

203.     By issuing these material misstatements and omissions, Disclosure Defendants Hees, Basilio and Knopf breached their fiduciary duties, including their duty of candor to shareholders.

204.



205.     By approving the materially misleading 2018 2Q 10-Q, Disclosure Defendants Abel, Behring, Cahill, Cool, Dewan, Jackson, Lemann, Pope, Telles, Van Damme and Zoghbi breached their fiduciary duties, including their duty of candor to shareholders.

## COUNT III

**(For Contribution For Violations Of Sections 10(B) And 21D Of The Exchange Act)**

206.    Defendants Hees, Basilio, Knopf, Behring and Zoghbi are named defendants in the securities fraud class action also pending in this Court, captioned *Union Asset Management Holding AG v. The Kraft Heinz Company*, No. 1:19-cv-01339 (N.D. Ill.) (the "Securities Class Action").

207.    Kraft Heinz is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, inter alia, violations of Section 10(b) of the Exchange Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omission of some or all of Defendants Hees, Basilio, Knopf, Behring and Zoghbi.  Under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), the Company is entitled to receive contribution from those Defendants in connection with the Securities Class Action against the Company.

208.    Defendants Hees, Basilio, Knopf, Behring and Zoghbi, as directors and officers, and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Kraft Heinz, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Further, Defendants Hees, Basilio, Knopf, Behring and Zoghbi are liable under Section 21D of the Exchange Act, 15 U.S.C., § 78u-4(f), which governs any right of contribution asserted pursuant to the Exchange Act.

209.    As a result, Defendants Hees, Basilio, Knopf, Behring and Zoghbi damaged Kraft Heinz and are liable to the Company for contribution.

210.     Plaintiffs, on behalf of Kraft Heinz, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.     An order declaring that Plaintiff may maintain this action on behalf of Kraft Heinz, and that Plaintiff is an adequate representative of the Company;

B.     An order declaring that Defendants have breached their fiduciary duties to Kraft Heinz;

C.     An order determining and awarding to Kraft Heinz the damages sustained by it as a result of the violations set forth above by Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.     An order imposing a constructive trust upon and ordering disgorgement of all profits made, or all losses avoided, by the 3G Defendants as a result of the fiduciary breaches alleged herein, together with pre-judgment and post-judgment interest thereon;

E.     An order directing Kraft Heinz and Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Kraft Heinz and its shareholders from a repeat of the wrongful conduct described herein;

F.     Awarding Plaintiff's costs and disbursements for this action, including reasonable attorneys' fees and expenses; and

G.     Granting such other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  March 20, 2020

*/s/ Thomas A. Zimmerman*

Thomas A. Zimmerman, Jr.
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Tel: (312) 440-0020
tom@attorneyzim.com

Hung G. Ta
JooYun Kim
Natalia D. Williams
HUNG G. TA, ESQ. PLLC
250 Park Avenue, 7th Floor
New York, NY 10177
Tel: (646) 453-7288
hta@hgtlaw.com
jooyun@hgtlaw.com
natalia@hgtlaw.com

Peter Safirstein
Elizabeth S. Metcalf
SAFIRSTEIN METCALF LLP
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 201-2855
psafirstein@safirsteinmetcalf.com
emetcalf@safirsteinmetcalf.com

William B. Federman
Federman & Sherwood
10205 North Pennsylvania Avenue
Oklahoma City, OK  73120
Tel: (405) 235-1560
wbf@federmanlaw.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, RICHARD MERRITTS, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint"), and I authorize its filing. The Complaint is true and correct to the best of my knowledge, information and belief. As to those allegations of which I have personal knowledge, I believe the allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel's investigation and also believe those allegations to be true. I am a holder of The Kraft Heinz Company ("Kraft Heinz") common stock, and I was a continuous holder of Kraft Heinz common stock during the period that is the subject of the allegations in the Complaint. I declare under penalty of perjury that the foregoing is true and correct.

DATE: _20_____ March, 2020

_____
Richard Merritts